## COUNTY OF SAN MATEO *v.* SOUTHERN PACIFIC R. Co.

*(Circuit Court, D. California.   1882.)*

1. REMOVAL OF CAUSE—DEFENSE UNDER CONSTITUTION AND LAWS.

    It is sufficient, to maintain the jurisdiction of the circuit court in a cause removed from a state court, that the defense necessarily involves a construction of a clause of the federal constitution.

2. SAME—ASSESSMENT OF PROPERTY OF RAILROAD.

    The validity of the assessment of the property of a railroad company, and of the provisions of state law discriminating between the assessment for taxation of the property of such companies and the property of individuals; and whether the fourteenth amendment of the federal constitution applies to artificial as well as to natural persons, may depend upon the proper construction of such amendment; and the right of the company to a reduction in the estimated value of its property assessed for taxation, by the amount of the morgtage due thereon, depends upon the construction of said amendment, and constitutes a case for relief arising under the constitution and laws of the United States, and is removable into the circuit court.

3. SAME—ACT OF 1875—VALIDITY OF.

    The terms "*suits* of a civil nature," used in the act of 1875, providing for the removal of causes from the state court into the circuit court, are less comprehensive than the term "cases," in the fourteenth amendment of the federal constitution, as the latter may embrace proceedings not usually nor strictly termed suits, as well as prosecutions of a criminal nature.   There can, therefore, be no question as to the validity of the legislation of congress.

FIELD, Justice.   This is an action to recover of the Southern Pacific Railroad Company, a corporation created under the laws of California, certain state and county taxes levied upon its property for the fiscal year of 1880 and 1881, and alleged to be due to the plaintiff, with an additional 5 per cent. for their non-payment and interest. It was commenced in the superior court of the county of San Mateo.

The railroad company, among other things, sets up in its answer. as a defense substantially this:   That by the thirteenth article of the constitution of the state a mortgage or other obligation, by which a debt is secured, is treated, for the purposes of assessment and taxation, as an interest in the property affected; that, "except as to railroad and other *quasi* public corporations," the value of the property less the value of the security is to be assessed and taxed to the owner, and the value of the security is to be assessed and taxed to its holder, (section 4;) that by the same article the franchise, roadway, road-bed, rails, and rolling stock of railroads, operated in more than one county, are to be assessed by the state board of equalization at their actual value, and apportioned to the counties, cities, or towns in

which the roads are located, in proportion to the number of miles of railway laid therein, (section 5;) that at the time of and previously to the assessment of the property of the railroad company, upon which the taxes claimed in this action were levied, there existed a mortgage upon the property, executed for advances made for the construction and equipment of the road, exceeding $3,000 for each mile of the same, no part of which has been paid except the accruing interest, and the whole of which was and still is a lien thereon; that the state board of equalization, acting under the authority of the provisions of the state constitution, assessed, as the property of the railroad company, its franchise, roadway, road-bed, rails, and rolling stock at what was deemed to be their actual value, without allowing any deduction for the mortgage subsisting thereon, and thus made, as between the property of individuals, and that of the railroad company, an unjust and unlawful discrimination against the company; and that the state constitution, in its discriminating provisions, conflicts with the inhibition of the fourteenth amendment of the constitution of the United States, which declares that no state shall deny to any person within its jurisdiction the equal protection of the laws. Upon that inhibition the company relies to defeat the assessment, or at least to reduce it by such deductions as are made in the estimate for taxation of the value of property held by individuals.

The railroad company also sets up among other things, as a further defense to the action, substantially this: That the section of the thirteenth article of the state constitution, which confers all the authority possessed by the state board to make the assessment complained of, is itself invalid in this: that while it is self-executing, requiring no legislation for its enforcement, it makes no provision for affording to the owners of the property assessed an opportunity to be heard respecting its valuation, but authorizes the board to act without notice to them, without receiving any information from them, and without liability to have its action reviewed, and, if erroneous, corrected by any other tribunal, making its judgment, however arbitrary and capricious, final and conclusive. And the company contends that in thus not affording to it an opportunity to be heard respecting the valuation of its property, while an opportunity is afforded to individuals for the correction of errors in the assessed value of their property, a discrimination is made against railroad companies within the inhibition of the fourteenth amendment.

Claiming in its answer protection under the amendment to the federal constitution against the enforcement of what it alleges to be partial and discriminating provisions of the state constitution, under which the state board acted and by which alone it justifies its action, the railroad company applied by petition to the state court to transfer the action to the circuit court of the United States. The required bond in such cases being filed, the transfer was made. The petition, among other things alleges that the supreme court of the state has decided that the railroad company is not entitled to the protection of the fourteenth amendment, or to any reductions for its indebtedness secured by mortgage in the estimate of its taxable property.

The plaintiff now moves that the action be remanded to the state court for trial, as not being removable to the federal court under the act of congress of March 3, 1875, to determine the jurisdiction of the circuit courts, and to regulate the removal of causes to them from the state courts.

By the federal constitution, the judicial power of the United States extends to all cases in law and equity arising under it, and under the laws of the United States, and treaties made under their authority. The act of 1875, in its first section, invests the circuit courts of the United States with original cognizance, concurrent with the courts of the several states, "of all suits of a civil nature, at common law or in equity, thus arising, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars. Its second section declares that any suit of that character thus arising, brought in a state court, may be removed by either party into the circuit court of the United States. The terms used in the act— "*suits* of a civil nature"—are less comprehensive than the term "cases" in the constitution. The latter may embrace proceedings not usually or strictly termed suits, and prosecutions of a criminal nature. There can, therefore, be no serious question as to the validity of the legislation of congress.

The inquiry is as to its meaning; and upon this there might be room for much difference of opinion, if its construction had not already been determined. If we were at liberty to give our view of its meaning, we should not hesitate to limit the authority to remove suits of a civil nature from a state court to a federal court, under the act in question, to those in which the cause of action arises upon the constitution, laws, or treaties of the United States, and not extend it to cases where the defense, as here, rests merely upon some right or

privilege claimed under them. Here the cause of action arises upon the constitution and laws of the state prescribing the manner and conditions on which its sovereign right of taxation shall be exercised. There are eminent fitness and propriety in having all such causes disposed of by the local courts, and in not having them carried into the federal courts, with their attendant delays and expense. But the construction we might give, if the question were one of first impression, we are not permitted to give. The supreme court has already passed upon the meaning of the act, and held in express terms against the view suggested. In *Railroad Co.* v. *Mississippi* (102 U. S. 135) that court reaffirmed what had been previously declared, that cases arising under the laws of the United States are such as grow out of the legislation of congress, whenever any right or privilege or claim or protection or defense of the party, in whole or in part, is asserted under them. Equally, therefore, cases must be held to arise under the constitution, when upon any of its provisions some right or privilege or claim or protection or defense, in whole or part, is asserted in a judicial proceeding. In the Mississippi case, which was brought in a state court, the defendant, setting up certain rights claimed under an act of congress, prayed for a removal to a federal court under the act of 1875, and the supreme court held that the party was entitled to it, Mr. Justice Miller dissenting on the ground urged here, that a removal was only authorized when the cause of action was founded on the law of congress, and not where the defense rested upon it; that in this latter case the remedy of the defendent for an adverse ruling was by an appeal after judgment to the supreme court of the United States. The decision of the majority of the court overruling the position of Mr. Justice Miller disposes of the same position taken here.

The construction given by the court is binding upon us, until modified or reversed, as fully as though we had participated in it and adopted its conclusions. Long previously to that decision, Chief Justice Marshall, speaking for the court, had held that a case might be said to arise under the constitution or laws of the United States, wherever its decision depended upon the correct construction of either, or when the title or right set up by a party might be defeated by one construction or sustained by the opposite construction. *Osborne* v. *Bank of U. S.* 9 Wheat. 822. If the removal authorized by the act of 1875 is not limited to those cases where the cause of action arises upon the constitution, laws, or treaties of the United States, this ruling of the chief justice would also lead to the

conclusion reached in the Mississippi case. The validity of the assessment of the property of the railroad company, and of the provisions discriminating between the assessment for taxation of the property of such companies and of the property of individuals, may depend upon the construction given to the fourteenth amendment, and the determination whether it applies to artificial bodies as well as to natural persons. The right of the company to a reduction in the estimate of the value of its property assessed for taxation, by the amount of the mortgage thereon, would be defeated by the construction of that amendment for which the plaintiff insists, and might be sustained by the construction for which it contends. Its case for relief, according to the decisions mentioned, therefore, arises under the constitution of the United States.

Whether the fourteenth amendment applies to corporations as well as to natural persons, is a question which cannot be determined on this motion. It will come up for determination upon the trial of the action in the consideration of the merits of the company's defense. It is enough to maintain the jurisdiction of this court, according to the decisions mentioned, that the defense necessarily involves a construction of a clause of the federal constitution.

It may not, however, be out of place to make some suggestions as to the force of the fourteenth amendment, in order to draw the attention of counsel to the difficulties in its application in the present case, which they must be prepared to meet on the trial. That amendment was undoubtedly proposed for the purpose of fully protecting the newly-made citizens of the African race in the enjoyment of their freedom, and to prevent discriminating state legislation against them. The generality of the language used necessarily extends its provisions to all persons of every race and color. Previously to its adoption the civil-rights act had been passed, which declared that citizens of the United States of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, should have the same right in every state and territory to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, own, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens; and should be subject to like punishments, pains, and penalties, and to none other. The validity of this act was questioned in many quarters; and complaints were made that notwithstanding the abolition of slavery and involuntary servitude, the freedmen were

in some portions of the country subjected to disabilities from which others were exempt. There were also complaints of the existence in certain sections in the southern states of a feeling of enmity, growing out of the collisions of the war, towards citizens of the north. Whether these complaints had any just foundation is immaterial. They were believed by many to be well founded, and to prevent any possible legislation hostile to any class from the causes mentioned, and to obviate objections to legislation similar to that embodied in the civil-rights act, the fourteenth amendment was adopted. This is manifest from the discussions in congress with reference to it. There was no diversity of opinion as to its object between those who favored and those who opposed its adoption.

The concluding clause of its first section was designed to cover all cases of possible discriminating and partial legislation against any class, in ordaining that no state shall deny to any person within its jurisdiction the equal protection of the laws. Equality of protection is thus made the constitutional right of every person; and this equality of protection implies not only that the same legal remedies shall be afforded to him for the prevention or redress of wrongs and the enforcement of rights, but also that he shall be subjected to no greater burdens or charges than such as are equally imposed upon all others under like circumstances. No one can, therefore, be arbitrarily taxed upon his property at a different rate from that imposed upon similar property of others, similarly situated, and thus made to bear an unequal share of the public burdens. Property may indeed be classified, and different kinds be subjected to different rates. Real property may be taxed at one rate and personal property at another. Property in particular places may be taxed for local purposes, while property situated elsewhere is exempt. License taxes may also vary in amount, according to the calling or business for which they are exacted. But arbitrary distinctions not arising from real differences in the character or situation of the property, or which do not operate alike upon all property of the same kind similarly situated, are forbidden by the amendment. Equality in the imposition of burdens is the constitutional rule as applied to the property of individuals, where it is subject to taxation at all; and this imports that an uniform mode shall be followed in the estimate of its value, and that the contribution exacted shall be in some uniform proportion to such value prescribed, according to the nature or position of the property. All state action, constitutional or legislative, impinging upon the enforcement of this rule, must give way be-

fore it.   Congress, in its legislation since the adoption of the amendment, has recognized this to be the rule.    The amendment was adopted in 1868, and in 1870 congress re-enacted the civil-rights act; and to the clause that all persons within the jurisdiction of the United States should enjoy the same rights as white citizens, and be subject only to like punishment, pains, and penalties, it added; and be subject only to like "*taxes, licenses, and exactions of every kind, and to no other.*"   Rev. St. § 1977.

Looking at the object of the amendment, it must be admitted that it was intended primarily for the protection of the rights of natural persons; its language is mainly applicable to them.   If it also include artificial persons, as corporations, whenever its language is susceptible of application to them, it must be because the artificial entity is composed of natural persons whose rights are protected in those of the corporation.   It may be that the chain which binds the individuals into a single artificial body, does not keep them in their united form from the protection of the amendment.   Corporations are not citizens,—the term applies only to natural persons,—and yet they are treated as citizens within the clause of the constitution which defines the judicial power of the United States, and declares that it shall extend to controversies between citizens of different states.

"That name, indeed," (of the corporation,) says Chief Justice Marshall, "cannot be an alien or a citizen, but the persons whom it represents may be the one or the other; and the controversy is, in fact and in law, between those persons suing in their corporate character, by their corporate name, for a corporate right, and the individual against whom the suit may be instituted.   Substantially and essentially the parties in such a case, where the members of the corporation are aliens or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the constitution on the national tribunals.   Such has been the universal understanding on the subject." *Bank of U. S.* v. *Deveaux,* 5 Cranch, 61.   See, also, the cases cited in the opinion of the chief justice.

The fifth amendment to the constitution contains a prohibition upon the government of the United States, similar to the one in the fourteenth amendment against the action of the states, declaring that no person shall be deprived of life, liberty, or property, without due process of law; and it has been assumed, if not expressly held, that the provision protects the property of corporations against confiscation equally with that of individuals.

As thus seen, the question which will be presented for our determination on the trial of this case is one of the greatest importance. We express no opinion upon it, but invite for it the most thoughtful consideration of counsel. And in their discussions the control of the state over corporations of its creation, where a reserved power of amendment is embodied in their charters or imposed by the constitution, should be considered. The general tendency of modern decisions is to treat corporations with this reserved power as subject at all times to the will of the state as to their rights, powers, and liabilities. Such unlimited control, asserted in some cases, would, indeed, lift them not only out of the protection of the fourteenth amendment, but also out of nearly all protection, except such as the legislative pleasure of the hour may permit. · ˙ ·

The motion to remand is denied.